IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EMILY RIVERA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 03 C 1863 |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Emily Rivera has sued the City of Chicago for indemnification under Rule 69(a) of the Federal Rules of Civil Procedure and 745 ILCS 10/9-102. Rivera's suit arises from an incident on June 21, 2001 during which Mario Morales, an off-duty Chicago police officer, came to Rivera's home, falsely claimed he had a search warrant, and unlawfully detained and handcuffed her. Morales was also prosecuted criminally for offenses relating to this incident and others; he pled guilty and was sentenced to a term of 294 months imprisonment.

On March 14, 2003, Rivera filed suit against Morales pursuant to 42 U.S.C. § 1983. She claimed that Morales's actions on June 21, 2001 violated her rights under the Fourth Amendment and state law. This Court entered a $175,000 default judgment against Morales.

On October 21, 2004, Rivera filed this supplemental collection proceeding against Morales's employer, the City of Chicago. The City of Chicago moved to dismiss for lack of subject matter jurisdiction, arguing that the Court should not exercise its ancillary jurisdiction because the City was not a party to the original suit. *Id.* The Court denied the motion on the

1

authority of *Yang v. City of Chicago*, 137 F.3d 522 (7th Cir. 1998), in which the Seventh Circuit held that a district court has ancillary jurisdiction over an indemnification proceeding against a third party so long as the supplemental proceeding "'does not inject so many new issues that it is functionally a separate case.'" *Id.* at 526 (citing *Wilson v. City of Chicago,* 120 F.3d 681, 684 (7th Cir. 1997)).

Following discovery, the City moved for summary judgment. For the reasons outlined below, the Court grants the City's motion.

## Facts

On June 21, 2001, Rivera lived at 2548 North Tripp Avenue on the second floor of a two-flat building. At the time, she lived with her boyfriend Jerome Carman and two of her children, who were one-month old and seven years old. That night, Rivera was home with her children. Some time between 11:30 p.m. and midnight, Rivera heard someone pounding on the back door to her apartment. She walked downstairs and asked who was there. The person identified himself as a Chicago police officer and told her to open the door. Rivera complied. Prove-up Tr. at 3-6.

Rivera states that the man at her door – who she later learned was Morales – wore jeans, a t-shirt, a black bulletproof vest, and a badge pouch she had seen police officers wear. *Id.* at 7; Rivera Dep. at 63-66. Rivera did not see Morales's badge because it was turned to face away from her, Prove-up Tr. at 63-64, but in his plea agreement in the criminal case, Morales stated he was wearing his badge. Plea Agreement at 6. Rivera states that Morales was also carrying a long, black flashlight that she had seen police officers use. Prove-up Tr. at 8. Morales stated that he was carrying a gun, *see* Morales Plea Agreement at 6, but Rivera has never claimed that

2

Morales had a weapon.

Once Rivera opened the door, Morales told her that he had a search warrant for the premises. He grabbed Rivera's arm and took her to the front room. He then stopped her and demanded, "Where's the shit at?" Rivera responded that she did not know what he was talking about. She then heard her one-month old son crying upstairs. She told Morales several times that her son was crying – most likely because it was his feeding time – but Morales ignored her and repeatedly asked, "where's the shit?" Prove-up Tr. at 7-10.

After Rivera expressed concern for her son several times, Morales pulled Rivera's hands behind her back and took her up the stairs to her bedroom. Once there, he handcuffed Rivera's hands behind her back. He then sat Rivera on her bed next to her son. Because her hands were handcuffed behind her back, Rivera told Morales she could not feed her son, who was lying on the bed. Morales responded that he would put the child in her lap. As Morales proceeded to do so, Rivera told him she still could not feed her son if her hands were handcuffed behind her. Morales then took Rivera's son off her lap and placed him on the bed again. *Id.* at 10-13.

At this point, Rivera asked Morales for a search warrant. Morales said he would go downstairs to get it. Before leaving the room, Morales also told Rivera he knew where she worked. *Id.* at 13-14.

Rivera waited in her room for about five minutes and then freed one hand from the handcuffs because it was quite loose. *Id.* She then pulled her other hand out. Rivera Dep. at 75-76. It is unclear what Rivera heard at this time: during the prove-up hearing, Rivera stated that she did not hear anything, Prove-up Tr. at 14-15, but at a later deposition, she said she heard "scrambling and walking" downstairs, which she believed to be Morales's partner. Rivera Dep.

3

at 70. Morales has confirmed that he let another person into the apartment– James O'Neill, a criminal associate with whom Morales stole drugs and money, possessed and distributed drugs, and kidnapped members of rival criminal gangs. *See* Plea Agreement at 3-8.

At the deposition, Rivera stated that after she stopped hearing noises for some time – it is unclear how long – she went downstairs. Rivera Dep. at 74-75. She did not see anyone in the apartment, but she saw her home was "ransacked." Prove-up Tr. at 15-16. Rivera called her brother to come to her home, and she left the apartment to stay at her mother's home that night because she was scared. *Id.* at 16-17. After this incident, Rivera did not call the Chicago Police Department; she claims she "was scared because the police did come to my house." *Id.* at 19.

Rivera states she did not learn the name of the police officer who came into her home until she saw a newspaper article about Morales being arrested for breaking into other homes. Rivera Dep. at 71-72. Approximately one year after the incident, Rivera received a telephone call from federal prosecutors who wanted to speak with her about Morales breaking into her home. *Id.* at 73-74. This was the first time Rivera discussed the incident with law enforcement officials. Rivera states that she thinks about this incident every other day and that she continues to be scared of the police. Prove-up Tr. at 17-18.

During the period in question, Morales was assigned to the third watch in the Chicago Police Department's (CPD) Alternative Response Section (ARS). The ARS, which is part of the CPD's Bureau of Staff Services, is located at Chicago's 311 non-emergency call center and serves as the CPD's liaison to the 311 section of the city's Office of Emergency Management Communication. Officers assigned to ARS "perform [their] duties at the call center," and they are not on patrol duty. On June 21, 2001, however, Morales had the day off. Brady Aff. ¶ 3-4.

According to Charles Williams, Deputy Chief of the CPD, "Morales's conduct...violated CDP (sic) rules, regulations, orders, policies and procedures, and served no law enforcement purpose or CPD or City interest." Williams Aff. at 3.

On January 21, 2004, Morales signed a plea agreement with the U.S. Attorney for the Northern District of Illinois in which he pled guilty to racketeering in violation of 18 U.S.C. § 1962(d) and possessing a firearm in furtherance of and in relation to a drug trafficking violation under 18 U.S.C. §§ 924(c)(1)(a) and (2). Plea Agreement at 2. This Court sentenced Morales to a total of 294 months in prison for racketeering and possession of a firearm. In his plea agreement, Morales specifically admitted to entering Rivera's home on June 21, 2001 with his badge and gun, falsely claiming he had a search warrant, handcuffing Rivera, and searching her home "even though he was not conducting official police business." *Id.* He further stated that he committed these acts "in order to steal the drugs and money stored inside." *Id.*

## Discussion

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c). The Court must view the facts in favor of the non-moving party and draw all reasonable inferences on her behalf. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If there is insufficient evidence for a jury to return a verdict for the non-moving party, however, the Court should grant summary judgment. *Id.* at 249-50.

Federal Rule of Civil Procedure 69(a) permits a judgment creditor to seek execution using the practice and procedure of the forum state. Illinois's Local Governmental and

5

Governmental Employees Tort Immunity Act provides that:

> A local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages (and may pay any associated attorney's fees and costs) for which it or an employee while acting within the scope of his employment is liable in the manner provided in this Article.

745 ILCS 10/9-102. The parties agree that the determinative question in this case is whether Morales was acting in the scope of his employment as a Chicago police officer when he entered Rivera's home, detained and handcuffed her, and searched her home. Def. Mem. at 2; Pl. Resp. at 2.

In an action for indemnification, Illinois law defines what conduct falls within the scope of one's employment. *Copeland v. County of Macon*, 403 F.3d 929, 932 (7th Cir. 2005). Though there is no precise definition of scope of employment, the Illinois Supreme Court has adopted the analytical approach outlined in the Restatement (Second) of Agency:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>     (a) it is of the kind he is employed to perform;
>     (b) it occurs substantially within the authorized time and space limits;
>     (c) it is actuated, at least in part, by a purpose to serve the master, * * *
>                 * * * * * *
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

*Pyne v. Witmer*, 129 Ill. 2d 351, 359-60, 543 N.E.2d 1304, 1308 (1989) (citing Restatement (Second) of Agency § 228 (1958)). The Illinois Supreme Court cautioned that "[o]nly if no reasonable person could conclude from the evidence that an employee was acting within the course of employment" should a court grant summary judgment on this issue. *Id.*

The Illinois Supreme Court last addressed the issue of scope of employment in the indemnification context in *Wright v. City of Danville*, 174 Ill. 2d 391, 675 N.E.2d 110 (1996).

During settlement negotiations in a voting rights lawsuit against the city of Danville, city commissioners and corporation counsel negotiated an agreement to change the structure of city government to increase African-American representation. In the process, they arranged to have administrative positions in the new government and to set their salaries themselves. The county tried and convicted these officials for conflicts of interest and official misconduct. The officials in turn sued the city to indemnify them for attorney's fees and litigation expenses incurred in defending against the criminal charges. They made this claim based on a Danville city ordinance which, pursuant to section 9-102, limits indemnification to acts committed within the scope of employment.

The court found that the commissioners and corporation counsel were not acting within the scope of employment. First, the duties of commissioners and corporation counsel did not include furthering their own interests. According to the court, the officials' employment "provided the opportunity for their misconduct," but they were neither employed to negotiate for themselves nor was doing so "incidental to the performance of their duties." *Id.* at 407, 675 N.E.2d at 119. Second, though the officials were authorized to negotiate on behalf of the city, they were not authorized to "utilize[] the negotiations to illegally advance their own personal interests by preserving their employment." *Id.* at 406, 675 N.E.2d at 118. Third, the officials were motivated solely by their own interest: they admitted their goal in the negotiation was to protect their employment and salaries, and their convictions, according to the court, further demonstrated that motive. *Id.* at 406-07, 675 N.E.2d at 118-19. Thus, the court held that the city had no duty to indemnify the commissioners or corporation counsel. *Id.* at 407-08, 675 N.E.2d at 119.

In the instant case, no reasonable jury could find that Morales was acting within the scope of his employment as a Chicago police officer when he announced himself as a Chicago police officer, falsely claimed he had a warrant, detained and handcuffed Rivera, and searched her home.

First, no reasonable jury could find that Morales's actions were "of the kind" he was hired to perform. *See Pyne*, 129 Ill. 2d at 359-60, 543 N.E.2d at 1308. Rivera correctly points out that acts that are of the "same general nature as those authorized" and acts that are "'incidental' to authorized conduct" fall within the scope of employment. Pl. Resp. at 4; *Gaffney v. City of Chicago*, 302 Ill. App. 3d 41, 50, 706 N.E.2d 914, 920 (1999) (citing Restatement (Second) of Agency § 229(1) and cmt. a (1958)). It is true that several of the acts Morales committed could have been done by a police officer on official business. He announced he was a police officer; he stated he had a search warrant; and he carried police paraphernalia, including a badge holder, bulletproof vest, gun, and flashlight. *See* Prove-Up Tr. at 6-8; Rivera Dep. at 63-66; Morales Plea Agreement at 6. These actions alone, however, are not enough to permit a jury to find that Morales's actions were "of the kind" he was hired to perform.[1] Just as the city officials in *Wright* were not employed to use settlement negotiations for their own personal interests, Morales was not employed to use the tools and techniques of policing for the purpose

---

[1] To support her argument, Rivera cites *Coleman v. Smith*, 814 F.2d 1142 (7th Cir. 1987). In *Coleman*, a mayor and chief of police were found liable for unlawful firing and false arrest and sued the city for indemnification. The court held that the officials' actions, though extreme, fell within their broad, discretionary powers. *Id.* at 1150. Rivera essentially argues that because Morales engaged in conduct that is "commonly performed by police officers," that conduct falls within the scope of Morales's employment as a police officer. *See* Pl. Resp. at 7. This approach, which focuses on the technical similarities between the acts the defendants performed and the acts they had been hired to do, is inconsistent with the Illinois Supreme Court's later holding in *Wright*. *See Coleman*, 814 F.2d at 1149-50; *Wright*, 174 Ill. 2d at 407, 675 N.E.2d at 119; *Dorsey v. Givens*, 209 F. Supp. 850, 851-53 (N.D. Ill. 2001).

of stealing drugs and money.  *See Wright,* 174 Ill. 2d at 407, 675 N.E.2d at 119; Plea Agreement at 6; Williams Aff. ¶ 8.

Rivera argues that Morales's conduct fell within the scope of his employment, despite the police department's lack of authorization, because the department had reason to expect that Morales would engage in this type of behavior.  Pl. Resp. at 7-8.  Specifically, Rivera contends that based on a series of dismissed complaints against Morales, the City could have expected that he would abuse his authority as a police officer to enter an individual's home without a search warrant, detain her, and search her home for drugs and money.  *Id.*  For present purposes, we assume that Rivera is correct that the City knew or should have known about the threat Morales posed, though we note that the Chicago Police Department sustained only one of the complaints, and none of the complaints submitted in opposition to the defendant's motion for summary judgment involved any sort of home invasion.  Def. Ex. 2.

Rivera's argument is premised on a misunderstanding of section 229(2)(f) of the Restatement (Second) of Agency.  Under that provision, an employee's acts, even if unauthorized, may be within the scope of employment if the employer can expect the acts based on the nature of the work the employer has authorized.  Restatement (Second) of Agency § 229 cmt. b (1958).  There is nothing inherent about policing, however, that puts a police department on notice that its personnel will misuse their positions to force themselves into dwellings and detain the occupants in order to steal their belongings.  Indeed, the fact that Morales was committing a serious crime for which he was later convicted by entering Rivera's home to search for and steal drugs and money is "a factor indicating that [the act] is not in the scope of employment."  *Id.* cmt. f.  Rivera has not produced any evidence from which a jury could find

9

that the City could have expected Morales's criminal actions based on his position as a police officer or his prior activity.[2]

Second, based on the evidence Rivera has offered, no jury reasonably could find that Morales's conduct fell "substantially within the [] time and space limits" authorized by the Chicago Police Department. *Pyne*, 129 Ill. 2d at 360, 543 N.E.2d at 1308. Courts read this requirement broadly: an employee may have acted outside regular business hours, but his conduct can still fall within the scope of employment if he has continuing duties to his employer while technically off-duty. *Gaffney*, 302 Ill. App. 3d at 50; 706 N.E.2d at 920. In *Gaffney*, an off-duty Chicago police officer negligently stored his gun, and his son used it to shoot a boy at a party. In overturning a JNOV entered by the trial court judge, the Illinois Appellate Court found that a jury could reasonably find that the police officer was acting within the scope of employment in negligently storing his weapon. *Id.* at 58, 706 N.E.2d at 926. Specifically, the Court concluded that a jury could have found that the police officer's actions fell within "authorized time and space limits" because he was responsible for responding to emergencies even when he was off-duty, he stored his gun to make it more accessible in case an emergency arose, and the police department trained and disciplined officers regarding off-duty gun storage. Id. at 52-54, 706 N.E.2d at 920-22.

Rivera cites *Gaffney* to support her argument that though Morales was off-duty, his actions were authorized by the Chicago Police Department. The undisputed facts belie this argument. Not only was Morales off-duty on the date in question, but he was not assigned to be

---

[2] Rivera's argument sounds more like an attempt to establish a pattern or practice claim under *Monell v. Department of Social Services*, 436 U.S. 658, 694-95 (1978), than an argument in support of indemnification under section 9-102. The City correctly points out, however, that Rivera has never brought such a claim, and the statute of limitations on any potential claims has already expired. Def. Reply at 11.

on patrol. Brady Aff. ¶ 4. Instead, he was assigned to the Chicago Police Department's Alternative Response Section: he performed all of his work at the City's 311 non-emergency call center. *Id*. Moreover, there is no indication that there was any emergency at Rivera's residence which might have authorized an off-duty, non-patrol police officer to enter Rivera's home, detain her, and search the premises. Based on this evidence, no reasonable jury could find that Morales's actions were authorized by the Chicago Police Department.

Finally, no reasonable jury could find that Morales's actions were even partly motivated by a purpose to serve the Chicago Police Department. Rivera cites only one fact in support of the argument: that Morales identified himself as a police officer. Pl. Resp. at 8. This fact is not an adequate basis for a reasonable jury to find that Morales was acting on behalf of the Chicago Police Department. In *Wright*, the Illinois Supreme Court clearly indicated that one cannot infer an employee is acting on behalf of his employer simply because he identifies himself as working for that employer and representing that employer's interests. *Wright*, 174 Ill. 2d at 406-07, 675 N.E.2d at 118-19. Rivera argues that Morales's motivation is a question of fact for a jury because "the line of demarcation between what motivated Morales in the instant case is elusive, incapable of being resolved with clarity." Pl. Resp. at 6. To survive the City's motion for summary judgment, however, Rivera "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). She has not met this burden.

Rivera also encourages this Court to adopt what it calls a "developing trend" in the Seventh Circuit about what conduct falls within the scope of employment for purposes of section 9-102. Pl. Resp. at 3. This statement mischaracterizes the current state of the law in the

11

Seventh Circuit and fails to appreciate the fact that the Illinois Supreme Court is the ultimate authority regarding this issue of Illinois law.

Rivera cites two cases in support of her argument that a broader array of police misconduct should fall under the scope of employment. In both cases, *West v. Waymire*, 114 F.3d 646 (7th Cir. 1997), and *Doe v. City of Chicago*, 360 F.3d 667 (7th Cir. 2004), Judge Posner provided a policy rationale for holding cities to a higher standard of accountability for police misconduct. *West* is not pertinent because it involves a 42 U.S.C. § 1983 claim, not an indemnification claim, but *Doe* did involve a claim under section 9-102.

In *Doe*, a woman sued a Chicago police officer under 42 U.S.C. § 1983 and state law for sexually harassing her on multiple occasions. She also sued the City of Chicago for indemnification. The district court granted the City summary judgment based on a finding that the police officer was not acting within the scope of employment. The facts indicated that the police officer had used his position to enable him to sexually harass the plaintiff. Based on the law of other jurisdictions and multiple policy justifications, Judge Posner, writing for the court, suggested that the scope of employment might be interpreted more broadly when the employee in question is a police officer. *Id.* at 671. Judge Posner clearly acknowledged, however, that the decision to make such a doctrinal shift is within the purview of the Illinois Supreme Court, not the federal appellate or district courts. *Doe*, 360 F.3d at 671-72. Ultimately, the Seventh Circuit reversed the grant of summary judgment, but it did so based on a finding that summary judgment on the issue of indemnification was inappropriate because liability had yet to be adjudicated. *Id.* at 673. In short, *West* and *Doe* do not permit this Court to disregard the precedents of the Illinois Supreme Court.

Finally, Rivera contends that the City should indemnify Morales because he was acting with the "apparent authority" of a Chicago police officer. Pl. Resp. at 9-11. She suggests that Morales acted with the apparent authority of the Chicago Police Department because he said he was a police officer and wore police paraphernalia. As a result, Rivera argues Morales was acting within the scope of his employment. Rivera misapplies the concept of liability based on apparent authority. *Id.* at 10-11 (citing Restatement (Second) of Agency § 219 (1958)). Apparent authority is an alternate theory for establishing liability if an employee has not acted within the scope of his employment. *Id.* at § 219(2)(d) ("A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless ...(d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation."). In this case, however, section 9-102 is clear: Morales must have acted within the scope of employment before the City could be required to indemnify him. There is no other statutory basis for obtaining indemnification.

## Conclusion

For the foregoing reasons, the Court grants defendant's motion for summary judgment (docket no. 25). The Clerk is directed to enter judgment in favor of the defendant City of Chicago on plaintiff's supplemental collection proceeding.

/s/ Matthew F. Kennelly<br>
MATTHEW F. KENNELLY<br>
United States District Court

Date: October 24, 2005